**BLANK ROME LLP**
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
(212) 885-5000
Rick Antonoff
Barry N. Seidel
Evan J. Zucker

*Attorneys for State Corporation "Deposit Insurance Agency" in its Capacity as Trustee and Foreign Representative for the Debtor*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re:

    **FOREIGN ECONOMIC**                         Chapter 15
    **INDUSTRIAL BANK LIMITED,**
    **"VNESHPROMBANK" LTD.**,              Case No. 16-13534 (   )

                   Debtor in a Foreign Proceeding.
-------------------------------------------------------------x

### DECLARATION OF SERGEY S. SOKOLOV
### IN SUPPORT OF VERIFIED PETITION AND RECOGNITION HEARING

I, Sergey S. Sokolov, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury as follows:

1.    I am a partner of Marks & Sokolov, LLC ("M&S"), a law firm with offices in Moscow, Russia and Philadelphia, Pennsylvania. I graduated from the Law School of St. Petersburg State University, summa cum laude, in 1993. I also received a bachelor's degree from the School of Economics at St. Petersburg State University. I have over 20 years of experience in legal practice. I prepared expert opinions on Russian law in *Belikov v. Huhs* heard in the Superior Court of the State of Washington, *Sullivan and Cromwell LLP v. James C. Justice II, et al.,* AAA case 01-15-0002-9299 and *In Re the Application of Natalia Potanina for an Order to*

1

*Take Discovery Pursuant to 28 USC 1782(a)*, 14-MC-31 (LAP) 14-MC-57 (LAP) in the United States District Court of the Southern district of New York. I have also prepared expert opinions on Russian law in confidential arbitrations. I maintain a practice in litigation, M&A, commercial real estate, international trade and bankruptcy, including under Federal Law № 127-FZ "On Insolvency (Bankruptcy)" (the "Russian Bankruptcy Law"). An English translation of the Russian Bankruptcy Law, as published by the State Corporation "Deposit Insurance Agency" (the "DIA") on their website[1], is attached hereto as Exhibit A.

2.  Although my native language is Russian, I am fluent in English, and have elected to execute and submit this declaration in English.

3.  I submit this declaration in support of the *Verified Petition Under Chapter 15 for Recognition of Foreign Main Proceeding* filed contemporaneously herewith.

4.  This declaration is comprised of matters that are statements of legal opinion and/or statements of fact. Where the statements are legal opinion, such statements represent my view of Russian law as a practicing lawyer. To the extent the statements are statements of fact, they are statements based upon my personal knowledge or based upon documents and/or information supplied to me by or on behalf of the DIA, the trustee and foreign representative of the Foreign Economic Industrial Bank Limited, "Vneshprombank" Ltd. (the "Bank" or "Debtor"), and are true to the best of my knowledge, information and belief. M&S has been retained by DIA to serve as its legal counsel in connection with the Russian Insolvency Proceeding.

**I.    Overview of Russian Bankruptcy Law**

5.  In Russia, the state commercial "arbitrazh courts" (also known as arbitration courts), such as the Moscow Arbitrazh Court, have exclusive jurisdiction over business issues

---

[1] *See* http://www.asv.org.ru/en/legislation/.

2

including issues related to the bankruptcy of Russian entities. The Russian Bankruptcy Law includes a procedure for the liquidation of a bank. *See* Paragraph 4.1 of the Russian Bankruptcy Law. The Russian Bankruptcy Law provides for a controlled procedure designed to maximize the value of a bank's assets, to provide an equitable distribution among a bank's depositors and other creditors, and, where the claims of a bank's creditors have been satisfied in full, enable the bank to avoid liquidation and recover its solvency.

6. The Central Bank of Russia is the main regulator of the Russian banking industry, responsible for issuing and revoking banking licenses, the rules of banking operations and accounting standards, and serving as a lender of last resort for banks.

7. The Central Bank of Russia may appoint a temporary administrator over a bank while it investigates the financial affairs and decides whether to rehabilitate or liquidate a bank. During this period of time, the Central Bank of Russia has the ability to temporarily restrict payments by the bank to its creditors. *See* Article 189.9 and 189.38 of the Russian Bankruptcy Law.

8. The Central Bank of Russia must revoke a banking license for a number of reasons including if: (i) the capital of a credit organization falls below the minimum charter capital requirement set as of the date of the state registration of the bank, or (ii) the value of the assets of a credit organization falls below minimum capital requirements. Additionally, the Central Bank of Russia has the authority, which it may or may not elect to exercise, to revoke a license for a number of reasons including if: (i) it is found that there is significant misleading information in the bank's financial reports, (ii) the bank repeatedly fails to comply with anti-money laundering legislation within a 12 month period, or (iii) the bank repeatedly fails to comply with banking laws in a 12 month period and has been subjected to measures provided for

in the Federal Law № 86-FZ "On the Central Bank of the Russian Federation (Bank of Russia)". *See* Article 20 of the Federal Law № 395-1 "On Banks and Banking Activity."[2]

9. After a bank's license has been revoked by the Central Bank of Russia, an insolvency petition can be filed against a bank and accepted by the Russian state arbitration court. A petition may be filed *inter alia* by the debtor, a creditor meeting certain criteria, or the Central Bank of Russia. *See* Article 189.61 of the Russian Bankruptcy Law.

10. Where an insolvent bank had a license for accepting deposits from individuals, once a petition is accepted, the DIA, a state owned corporation, is appointed as a trustee for the insolvent bank. *See* Article 189.77 of the Russian Bankruptcy Law. A copy of the court's order accepting the petition is published in the Unified Federal Register of Bankruptcy Data[3] and the following newspapers; (1) "Kommersant," and (2) "Herald of the Bank of Russia." *See* Article 189.74(1) of the Russian Bankruptcy Law. The DIA exercises its authority as a trustee through an authorized representative with power of attorney for the DIA. *See* Article 189.77(13) of the Russian Bankruptcy Law. The DIA submits a notice to the arbitration court and all other parties in interest of the individual who is the DIA's authorized representative. Article 189.77(14) of the Russian Bankruptcy Law.

11. The main goal of the DIA is to ensure that the rights of all creditors are protected. To achieve this goal, the DIA, among other things, timely verifies creditors' claims filed against a debtor, manages the bankruptcy estate, traces and challenges transactions that did not benefit the estate, takes measures focused on search, finding and recovery of the bank's assets possessed by third parties and pursues actions against persons that contributed to the bank's failure.

---

[2] An English translation of Federal Law № 395-1 "On Banks and Banking Activity," as published by the DIA, is available on their website at: http://www.asv.org.ru/en/legislation/.

[3] The Unified Federal Register of Bankruptcy Data is the primary means for providing notices regarding bankruptcy cases in Russia. The Unified Federal Register of Bankruptcy Data can be found at: http://www.bankrot.fedresurs.ru/

12. In connection with the DIA's ability to investigate the disposition of a bank's assets and to pursue actions against persons that contributed to the bank's failure, the Russian Bankruptcy Law authorizes the DIA to, *inter alia*, file any application necessary to search, find and recover the Bank's assets and perform other actions aimed at protection of rights and legitimate interests of the bank and the bank's creditors provided for in the federal laws and other normative legal acts of the Russian Federation. *See* Article 189.78 of the Russian Bankruptcy Law. Therefore, DIA is entitled to commence ancillary proceedings, including proceedings under Chapter 15 of title 11 of the United States Bankruptcy Code. Additionally, in furtherance of ancillary foreign proceedings, the Russian Bankruptcy Law provides that "[t]he decisions of foreign states' courts on insolvency (bankruptcy) cases shall be recognized in the territory of the Russian Federation in compliance with the international treaties of the Russian Federation. In case of lack of international treaties of the Russian Federation the decisions of foreign states' courts on insolvency (bankruptcy) cases shall be recognized in the territory of the Russian Federation on the basis of reciprocity." *See* Article 1 of the Russian Bankruptcy Law.

13. The Russian Bankruptcy Law provides for a register of creditors' claims for creditors to assert claims against a bank and a ranking of creditors' claims with a specific priority scheme for the distribution of estate assets. The register of creditors' claims of a bank is maintained by DIA. *See* Article 189.87 of the Russian Bankruptcy Law.

14. A creditors' committee is appointed after a meeting of all creditors and is charged with overseeing the interests of all creditors. *See* Article 17 and 18 of the Russian Bankruptcy Law.

15. After the DIA liquidates all of a bank's assets and distributes the assets to creditors, the DIA submits a report to the arbitration court summarizing results of the bankruptcy

5

proceeding. *See* Article 189.99 of the Russian Bankruptcy Law. After the court has considered the report, if the court is satisfied, the court will close the bankruptcy case. *See* Article 189.100 of the Russian Bankruptcy Law.

## II.  Overview of the Bank's Business

16. The Bank is privately owned by, among others, Ms. Larisa Markus. The Bank was incorporated as a limited liability company under the federal laws of the Russian Federation in July 1995. On July 3, 1995 the Central Bank of Russia issued the Bank its license (Registration No. 3261). Since receiving its first license in 1995, the Bank was granted a general banking license in 2001 and joined a deposit insurance system in 2004. The Bank's headquarters are located in Moscow and, until its banking license was revoked in January 2016, the Bank operated in 7 federal districts of Russia.

17. The Bank specialized in lending to medium-sized and large businesses. It was one of the 40 largest lenders in Russia in terms of assets. The Bank mainly engaged in traditional banking businesses of making corporate loans, providing guarantees, and other fee-based products marketed to corporate clients. The Bank's clients included members of the country's elite as well as the Russian Orthodox Church.

18. As of October 1, 2015, the Bank reported assets worth RUB 284.6 billion and equity capital of RUB 16.6 billion.[4]

19. Ms. Markus served as the Bank's President and member of its Managing Board and its Board of Directors.

---

[4]  As of November 8, 2016, 10 Russian ruble was equal in value to 16 U.S. cents.

**III.     Events Leading Up to, and the Current Status of, the Russian Insolvency Proceeding**

20. The Central Bank of Russia, on December 18, 2015, appointed a temporary administrator to oversee the Bank due to concerns regarding the Bank's liquidity and its violation of certain minimum capital requirements. The Central Bank of Russia, on December 22, 2015, additionally imposed a moratorium on the Bank's payment of creditor claims.

21. As was reported, on December 22, 2015, Ms. Markus was arrested on suspicion of a "large-scale" fraud. Ms. Markus' brother, Mr. Georgy Bedzhamov, may have also played a significant role in the fraud and has since fled to Monaco to escape arrest and is seeking asylum in Monaco.

22. Upon information and belief, Ms. Markus, acting with some accomplices, caused the Bank to enter into lending agreements with affiliated companies that had no intention of repaying, and failed to repay, the money borrowed from the Bank. As part of the investigation into the location of the Bank's money, it is believed that the funds embezzled by Ms. Markus found their way into the United States and were used, in part, to purchase New York real estate.

23. The Bank's liabilities exceed its assets by about RUB 214.5 billion.

24. The Central Bank of Russia decided against rehabilitating the Bank and revoked its license on January 21, 2016.

25. On March 11, 2016, on application of the Central Bank of Russia, the Moscow Arbitration Court declared the Bank insolvent and commenced a bankruptcy proceeding under the Russian Bankruptcy Law (the "<u>Commencement Order</u>"). A copy of the Commencement Order is attached hereto as Exhibit B. To the best of my knowledge, information and belief the insolvency proceeding initiated against the Bank in Russia is the only foreign proceeding

7

currently pending with respect to the Bank in accordance with section 1515(c) of the US Bankruptcy Code.

26. The Commencement Order appointed the DIA as the trustee for the Bank. Thereafter, in accordance with Russian Bankruptcy Law, the DIA on March 16, 2016 sent a report to the Moscow Arbitration Court designating Natalia Igorevna Korzhenkova as the authorized representative, with power of attorney, to act on behalf of the DIA in respect of the Russian Insolvency Proceeding.  A copy of the report is attached hereto as Exhibit C.  On November 10, 2016, the DIA sent a report to the Moscow Arbitration Court indicating that as of November 7, 2016 Mr. Alexander Viktorovich Khalizev succeeded Ms. Korzhenkova as the authorized representative to act on behalf of the DIA in respect of the Russian Insolvency Proceeding.  A copy of the report is attached hereto as Exhibit D and attached hereto as Exhibit E is Mr. Khalizev's Power of Attorney.[5]

27. The notice of the Debtor's creditors' claims bar date was published on February 6, 2016 in the newspaper "Kommersant" and "Bulletin of the Bank of Russia."

28. On June 17, 2016 a meeting of the Debtor's creditors was held in Moscow.

29. As of October 1, 2016, the DIA received claims from over 11,000 claimants for a total amount of approximately RUB 230 billion.

30. As of October 1, 2016, the DIA holds RUB 3.3 billion on deposit in the Central Bank of Russia for the benefit of the Bank's creditors.  The DIA expects to be able to pay creditors their pro rata share of such assets less costs of administration.  Currently, it is expected that general unsecured creditors of the Bank will receive payment of at least 12% of their

---

[5] Attached hereto as Exhibit F is a Translation Certificate, certifying that Exhibits B – E are true and accurate translations.

8

allowed claims. That percentage will increase to the extent that the DIA is successful in recovering assets fraudulently or otherwise wrongly transferred by the Bank.

**IV.    Pending Litigation In The United States District Court For the Southern District of New York**

31.    On March 22, 2016, Panabroker Protecting and Indemnity Association, S.A. ("Panabroker"), a Panamanian company and an alleged creditor of the Bank, commenced an action in the United States District Court for the Southern District of New York against the Bank and the New York LLCs (as hereinafter defined) (the "SDNY Litigation"). *See Panabroker Protecting and Indemnity Association, S.A. v. Vneshprombank, et al.*, Case No. 16-cv-02120 (ALC) (S.D.N.Y. 2016). An amended complaint was filed by Panabroker on July 26, 2016. A copy of the amended complaint is attached hereto as Exhibit G. According to Panabroker, it is owed approximately $1,570,421.93 from the Bank for commissions earned pursuant to certain agreements between the Bank and Panabroker. The complaint alleges claims against the Bank for breach of contract and violations of the Racketeer Influenced and Corrupt Organizations Act. It additionally alleges claims against the New York LLCs for unjust enrichment and violations of the Racketeer Influenced and Corrupt Organizations Act.

32.    The Bank has not been served with Panabroker's complaint and has not answered or otherwise appeared in the SDNY Litigation.

33.    The other defendants to the SDNY Litigation are numerous limited liability companies in New York including (1) LM-31B, LLC; (2) LM-27D, LLC; (3) LM-24C, LLC; (4) LM-23H, LLC; (5) LM-20A, LLC; (6) LM-18W, LLC; (7) LM-10C, LLC; and (8) LM Management, LLC (collectively the "New York LLCs"). As part of Ms. Markus' fraudulent scheme, allegations have been made that Ms. Markus formed each of the New York LLCs for the sole purpose of purchasing a specific condominium or cooperative apartment unit in New York

City. Upon information and belief, the funds used by the New York LLCs to purchase these properties came from funds held by the Bank for its customers and unlawfully transferred, directly or indirectly, by the Bank to the New York LLCs.

34. The NY LLCs have filed a motion to dismiss the claims asserted against them in the SDNY Litigation. The motion to dismiss is still being briefed and is expected to be heard in early 2017.

35. If the property owned by the NY LLCs rightfully belongs to the Bank, it is property that should be turned over to the DIA for the benefit of all of the Bank's creditors, not just Panabroker. Upon entry of an order recognizing this chapter 15 petition, the SDNY Litigation will be stayed. The DIA intends to investigate and determine whether the Bank has claims against the NY LLCs and other parties located in the United States.

36. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of December, 2016 in Moscow, Russia.

_____
Sergey S. Sokolov